WILLIAM P. BARR
ATTORNEY GENERAL

CRAIG CARPENITO
United States Attorney
KELLY HORAN FLORIO
Assistant U.S. Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
Tel: (973) 645-2824

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division
SAMEENA SHINA MAJEED
Chief
TAMAR HAGLER
Deputy Chief
RYAN G. LEE
BETH FRANK
Trial Attorneys
United States Department of Justice
Civil Rights Division
Housing & Civil Enforcement Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: (202) 305-8196
Beth.Frank@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>Plaintiff,<br><br>v.<br><br>**TOWNSHIP OF JACKSON and JACKSON PLANNING BOARD**,<br><br>Defendants. | Civil Action No.<br><br><br>**COMPLAINT** |

The United States of America, by its undersigned attorneys, files this Complaint and alleges:

## Introduction

1.  The United States brings this civil action against the Township of Jackson ("Jackson" or "Township") and the Township of Jackson Planning Board ("Planning Board") (collectively, the "Defendants") under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq. and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. ("FHA") stemming from the Defendants' enactment and application of zoning ordinances that intentionally target religious schools and housing associated with such schools so that it will be impossible or nearly impossible for religious schools, including religious boarding schools utilized by members of the Orthodox Jewish community ("Orthodox community") to operate in the Township.

## Nature of the Action

2.  In 2017, the Township passed Ordinance 03-17 and Ordinance 04-17 ("2017 Ordinances").  Ordinance 03-17 removed public, private, and parochial[1] schools as a permitted use in a number of Jackson's zoning districts.

3. Ordinance 03-17 and Ordinance 04-17 both expressly prohibit dormitories throughout Jackson, making it impossible for religious boarding schools to establish in the Township.

---

[1] For the purposes of the Complaint, the term "parochial schools" is interchangeable with the term "religious schools."

4.  These Ordinances were enacted against the backdrop of widespread animus toward the Orthodox community moving into Jackson and intentionally target the needs of the Orthodox community to establish religious schools and religious schools with associated dormitory housing within the Township.

5. As a result of the 2017 Ordinances, religious schools and religious schools with housing cannot establish in the Township.

6.  The Defendants specifically violated RLUIPA by: (a) treating parochial schools on less than equal terms than nonreligious assemblies in enacting and in applying the 2017 Ordinances, 42 U.S.C. § 2000cc(b)(1); and (b) discriminating against the Orthodox community on the basis of religion or religious denomination by enacting and applying the 2017 Ordinances, 42 U.S.C. § 2000cc(b)(2).

7.  The Defendants violated the FHA by intentionally discriminating against the Orthodox community in enacting and applying the 2017 Ordinances in an effort to make residential housing unavailable in the Township on the basis of religion, 42 U.S.C. § 3604(a).

## Jurisdiction and Venue

8.  The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, 42 U.S.C. § 2000cc-2(f), and 42 U.S.C. § 3614(a).

9.  Pursuant to 42 U.S.C. § 2000cc-2(f), the United States is authorized to commence suit against a local government for injunctive or declaratory relief to enforce compliance with RLUIPA.

10. Pursuant to 42 U.S.C. § 3614(a), the United States is authorized to commence suit against a person or persons for preventative relief, damages, and civil penalties.

11. Venue is proper under 28 U.S.C. § 1391(b) because the actions giving rise to this action occurred in the District of New Jersey.

## Parties

12. Defendant Jackson is a municipality in Ocean County, New Jersey.

13. Jackson occupies almost 100 square miles in Ocean County, including sections of the New Jersey Pine Barrens.  Jackson is also the site of Six Flags Great Adventure & Safari Park, the second-largest theme park in the world, as well as Six Flags Hurricane Harbor, its companion water park.

14. According to the 2010 Census, Jackson has approximately 55,000 residents.  Jewish residents make up approximately 4% of Jackson's population.

15. The area immediately surrounding Jackson has experienced a recent increase in the Orthodox Jewish population.

16. Jackson's municipal government consists of a Mayor elected to a four-year term and a five-member Township Council with members elected to four-year terms on a staggered basis.

17. Michael Reina is the current Mayor of Jackson, and has served as Mayor since December 2008.

18. Kenneth J. Bressi is a current member of the Township Council, and he has served on the Council since 2009.  Mr. Bressi also has been the Township Council's appointee to the Township Planning Board since 2006, and has served on

various Planning and Land Use Boards and Zoning Boards at various times since 1988.

19. Barry Calogero is a former member of the Township Council. He served on the Council from 2012 through May 13, 2020.

20. Robert A. Nixon is a former member of the Township Council. He served on the Council from 2012 through November 26, 2019.

21. Ann Updegrave is a former member of the Township Council, and served on the Council from 2006 to December 31, 2018.

22. Scott Martin is a former member of the Township Council, and served on the Council from 2006 to December 31, 2018.

23. The Township has the authority to regulate and restrict the use of land and structures within its borders.

24. Defendant Planning Board consists of nine members and two alternates. The members must include the Mayor, at least one other Township Official, a member of the Environmental Commission, and citizens of Jackson appointed by the Mayor. It has responsibility for, among other things, managing the Township's Master Plan and planning objectives, administering subdivision and site plan review, and granting variances related to subdivision plats.

25. For purposes of RLUIPA, the Township and the Planning Board each constitute a "government." 42 U.S.C. §§ 2000cc-5(4)(A)(i), (ii).

26. Defendant Jackson is responsible for the acts and omissions of its agents and agencies, including the Planning Board.

## Facts

### *The Orthodox Community in Jackson*

27. Approximately 500 Orthodox Jewish families live in Jackson Township.

28. The Orthodox community in and around Jackson Township is composed of multiple local subgroups, each with its own leaders and varying interpretations of religious doctrine and law.

29. As a general rule, the Orthodox community believes that a central element of its religious exercise is to educate its children in Orthodox Jewish schools, where they can learn the traditions and beliefs of their faith.

30. For the Orthodox community, religious life includes a focus on religious education to ensure the future of its subgroup and local community.  By attending religious schools, or yeshivas, the Orthodox community believes that young male students will receive training necessary to become active adult community members and religious leaders.

31. Members of the Orthodox community active in the Jackson area believe that yeshiva students must be removed from the distractions of secular life to concentrate on their studies in a community of religious practitioners and scholars and that they study day and night with a focus that can only be achieved by residing at the school.

32. Members of the Orthodox community active in the Jackson area require that yeshiva teachers closely supervise students' moral and spiritual development and believe that this can only be achieved in a full-time, residential environment.

6

33. There are currently no Orthodox Jewish religious schools in Jackson.

34. Without access to local yeshivas, members of the Jackson area's Orthodox community will be significantly inhibited in exercising their religious beliefs and unable to develop future community members and community leaders.

### *Jackson's Zoning Map and Zoning Districts*

35. The Jackson zoning map enumerates 45 zoning districts:  28 districts outside the Pinelands Area and 17 within the Pinelands Area, much of which is in the southern portion of Jackson and is zoned as preservation area or military.  A zoning map is included as Exhibit A to this Complaint.

36. The northern section of Jackson contains a large number of residential zones.  According to the zoning map, residential zoning districts comprise the majority of the Township.

37. The zoning map shows a number of Public Facility and Education "planning districts" ("PFE districts"), which are adjacent to residential zones and contain most of the Township's schools.  The Township's Zoning Code says nothing about PFE districts.

38. The Township's zoning map and Township's Zoning Code are "land use regulation[s]" under RLUIPA, 42 U.S.C. § 2000cc-5(5).

### *Jackson's Zoning for Schools Before 2017*

39. Before 2017, the Township's Zoning Code allowed private, parochial (religious), and public schools as permitted by-right uses in a variety of zoning districts, including residential zones R-2, R-3, R-5, R-9, R-15, R-20; multi-family

zones classified as MF, and in all Planned Mixed Unit Residential Development ("PMURD") zones.

40. Before 2017, the Township's Zoning Code allowed public schools, but not private or parochial schools, in the LC (Limited Commercial) and NC (Neighborhood Commercial) zoning districts.

41. Before 2017, public schools, but not private or parochial schools, were allowed as permitted by-right uses in the PV (Pinelands Village), RD-1 (Rural Development), and RG-2 and RG-3 (Rural Growth) zones.

42. Before 2017, the Township had ten public schools, a vocational technical school, a private day school, and two parochial schools (Jesus Harvest Time Academy and St. Aloysius School).

43. St. Aloysius, which closed in June 2019, was located in the LC zone, and the other schools are located in either the PFE zone or the PV zone.

44. In June 2014, Jackson's Zoning Board of Appeals ("ZBA") rejected plans for an all-girls Orthodox Jewish high school. As a result of this action, the school sued Jackson in New Jersey state court alleging RLUIPA claims. See <u>Oros Bais Yaakov High Sch. v. Twp. of Jackson & Jackson Twp. Zoning Bd. of Adjustment</u>, No.OCN-L-2891-14 (N.J. Super. filed Oct. 15, 2014). That litigation is currently pending.

### *Jackson's Zoning for Schools After 2017: Ordinance 03-17*

45. In 2017, the Township enacted Ordinance 03-17 which restricted where public and private schools, including parochial schools, could locate.

46. Ordinance 03-17 amended the Township Zoning Code to remove all schools, whether public or private, from the R-2, R-3, R-5, R-9, R-15, R-20, and MF zoning districts.

47. Ordinance 03-17 states that any use not "expressly permitted" in any zoning district is "expressly prohibited."

48. As a result of Ordinance 03-17, the Township Zoning Code only allows private schools, including parochial schools, to locate in the PMURD zone.

49. The Township's zoning maps shows that only one small PMURD zoning district exists in the Township.

50. Under Ordinance 03-17, public schools are still allowed as permitted by-right uses in the PV, RD-1, RG-2, RG-3, LC and NC zones.

51. The Township has not demonstrated, through statements in its codes, master plan, or elsewhere, that allowing private schools, including parochial schools, in the PV-RD-1, RG-2, RG-3, LC or NC zones would impair any zoning goals for the Township, that the presence of private schools in these districts would adversely impact any regulatory land use goals for those zoning districts, or that private schools, including parochial schools, would have zoning impacts such as traffic, parking, or noise that are different from or greater than the zoning impacts created by a public school.

52. Ordinances 03-17 and 04-17 are "land use regulation[s]" under RLUIPA, 42 U.S.C. § 2000cc-5(5).

### *Jackson's Zoning for Dormitories Before 2017*

53. Before 2017, in the R-2, R-3, and R-5 zones, "other customary accessory uses, buildings and structures, which are clearly incidental to the principal use and building" were permitted as accessory uses.

54. Dormitories are customary uses, buildings and structures that are incidental to the principal use of a school.

55. Before 2017, Jackson contained dormitories associated with a Six Flags theme park.  These dormitories currently are located in the Township's CR (Commercial Residential) zone.

### *Jackson's Zoning for Dormitories After 2017:*<br>*Ordinances 03-17 and 04-17*

56. Ordinance 03-17 broadly prohibited the establishment of dormitories in the Township and expressly banned them for religious or educational uses.

57. Ordinance 03-17 defines "dormitory" as "[a]ny building, or portion thereof, designed or converted to contain living quarters which are provided as residences or for overnight sleeping for individuals or groups, operated as an accessory use to a school, college, university, boarding school, convent, monastery, non-profit educational institution, religious order, or other."

58. Ordinance 03-17 then broadly prohibits the establishment of dormitories throughout the Township in the "Prohibited Uses" section:

> A. All uses not expressly permitted in any given district are expressly prohibited in such district.  No structure or addition thereto shall be built, moved or remodeled and no land shall be used, occupied, reoccupied, designed or improved for use or occupancy except for a use that is expressly permitted within the zone.

B. The following shall be prohibited as principal or accessory uses or structures in all zoning districts within the Township of Jackson:

(1) Dormitories

59. At the same time the Township enacted Ordinance 03-17, it also enacted Ordinance 04-17, which repeats verbatim the language of Ordinance 03-17 concerning dormitories in Jackson.

60. On January 30, 2019, the Township Planning Board approved a general development plan and site plan for a large complex near Six Flags Theme Park called Adventure Crossing that includes associated housing for a medical research center focused on multiple sclerosis. According to the meeting minutes, approximately 60 "special needs" units located directly above the research facility were approved so that researchers can work close to the population they will serve.

61. The Planning Board did not apply the "dormitory ban" under Ordinances 03-17 or 04-17 to Adventure Crossing's 60 special needs units.

62. On February 4, 2019, the Township Planning Board approved the general development plan proposed by Trophy Park, LLC, which is a multipurpose athletic complex with a commercial area to include restaurants, retail buildings and a hotel. The sports complex at the park will also feature "team suites" for visiting sports teams that would serve up to 1,800 children a week during the summer.

63. The team suites will serve as overnight sleeping quarters operating as an accessory to the sports complex. The team suites consist of 60 two-story buildings

with one team per floor and one single bed for each athlete, and a nearby dining hall where teams would eat according to a managed meal plan.

64. The Township Planning Board did not apply the "dormitory ban" under Ordinances 03-17 or 04-17 to Trophy Park's team suites.

65. During the course of two meetings on December 3, 2018 and February 4, 2019, Planning Board members questioned whether the proposed team suites were prohibited dormitories under Ordinances 03-17 and 04-17. The Planning Board determined that the team suites were not dormitories on two grounds: (1) the suites would not be used for academic or religious purposes; and (2) an athlete's stay at a team suite would be for less than 30 days.

66. Dormitories are "dwellings" as defined by the Fair Housing Act, 42 U.S.C. § 3602.

### Jackson's Zoning for Multi-Family Housing 2017 to Present

67. In June 2017, the Township enacted ordinances that established three multi-family affordable housing zoning districts: MF-AH-6, MF-AH-7, and MF-AH-8. MF-AH-6 permits multi-family housing for up to six units. MF-AH-7 and MF-AH-8 zones permit multi-family construction projects containing approximately 200 units.

68. The ordinances establishing the MF-AH-6, MF-AH-7, and MF-AH-8 added new zones to already-existing multi-family housing zoning districts.

69. The MF-AH-7 and MF-AH-8 zoning districts allow large-scale multi-family housing up to 400 total units that would have a similar if not greater zoning and land use impact on the Township than dormitories.

### Animus Toward Orthodox Community and Discriminatory Motives Behind Ordinances 03-17 and 04-17

70. Jackson shares part of its eastern border with Lakewood, NJ.  Since 2000, Lakewood's Orthodox Jewish population has grown greatly and members of the Orthodox community have moved into surrounding towns, including Jackson, bringing with them the community's culture and traditions, including dress, social rules, and religious requirements unique to it.

71. The relatively recent and rapid expansion of the Orthodox community into Jackson has resulted in tension between Orthodox and non-Orthodox residents.

72. Residents of Jackson, as well as other townships neighboring Lakewood, have expressed hostile views toward the Orthodox community and have expressed concerns that the Orthodox community will continue to increase and change the Township's culture.

73. Jackson officials have responded to the concerns expressed by non-Orthodox residents by making statements demonstrating that they are aware of and support residents' animus against the Orthodox community and by taking actions to adversely impact the ability of the Orthodox community to locate in the Township.

74. In August 2015, Township officials, in response to complaints that the Orthodox community from Lakewood was attempting to solicit Jackson residents to

13

sell their homes to Orthodox families, enacted Ordinance 18-15, known as the "No-Knock Ordinance," that established a registry upon which residents could place their names to restrict solicitors from canvassing directly at their homes.

75. In October 2015, then-Jackson Mayor Michael Reina, at a "Meet the Mayor" event urged residents not to sell their properties in order to preserve the character of the Township.

76. The No-Knock Ordinance was adopted in response to citizen complaints received by the Township, which included complaints about Orthodox Jews asking individuals to sell their homes.

77. In 2016, Jackson's Division of Code Enforcement, under the leadership of then-Council President Nixon, began investigating whether Orthodox community members were violating the Township Zoning Code's capacity and place-of-worship provisions by holding prayer group meetings on Friday nights in residential homes.

78. The level of resources the Division of Code Enforcement was expending on these investigations led Jackson's Business Administrator, Helene Schlegel, to write Mayor Reina and Council President Nixon to complain about the "valuable time and money checking every complaint that comes in" at the expense of "the other issues [that] are life threatening and safety issues that are affecting many of Jackson's youth and families" and stating that "we have to address all the issues in the Township, not just this issue."

79. Mayor Reina stated that he was aware of anti-Orthodox sentiment in the Township and received emails and comments from individuals that were anti-Semitic and who expressed hostility to the Orthodox community.

80. Opposition from non-Orthodox residents to the increased presence of the Orthodox community in Jackson has led a number of social media groups to express animus and hostility toward the local Orthodox community and the growth of the Orthodox population in Jackson.

81. These social media groups regularly post or have posted information about Jackson's Townships Council, ZBA, and Planning Board meetings and encourage residents to contact Township officials to express their views on these issues before, during, and after the enactment of the 2017 Ordinances.

82. Members of the Township Council actively followed these social media sites and were influenced by them and took official action in response to them.

### *Jackson Targets the Orthodox Community Through Ordinances 03-17 and 04-17*

83. The 2017 Ordinances were enacted in response to the growth of the Orthodox community and the complaints Township officials received from residents about the Orthodox community.

84. Township officials introduced the 2017 Ordinances at the February 14, 2017 Council meeting without providing any justification behind the Ordinances and unanimously approved them.

85. On February 28, 2017, the scheduled second reading of the 2017 Ordinances was heavily attended and a number of residents made comments in

15

support of the Ordinances as a way to prevent the Orthodox community from further populating Jackson.

86. On March 6, 2017 Planning Board reviewed and unanimously recommended that the Ordinances be sent to the Township Council for a public hearing on second reading.

87. During the time period of the public meetings concerning the 2017 Ordinances, Jackson residents made comments on social media expressing support of the Ordinances as a way to prevent the Orthodox community from further populating Jackson.

88. On March 14, 2017, the Township Council held a second hearing and public hearing for the 2017 Ordinances that was attended by a standing-room-only crowd where many residents made comments to considerable applause expressing that Jackson needed the 2017 Ordinances to prevent the Orthodox community from further populating Jackson during the meeting.

89. All of the Councilmembers present at the meeting voted to pass the 2017 Ordinances.

90. Former-Councilmember Martin, who voted for the 2017 Ordinances, stated that he was concerned that what had happened in Lakewood, with the construction of schools with dorms, would happen in Jackson.  He stated it was his assumption that most of the schools with dorms in Lakewood were built by the Orthodox Jewish community.

91. Councilmember Bressi stated that he and the Township Council were aware of Orthodox Jewish schools having dormitories because of the presence of such schools and dormitories in nearby towns, and that the motivation for the 2017 Ordinance was to keep Orthodox Jews from moving to Jackson.

92. Councilmember Bressi stated that former Councilmember Calogero told him that "The first dorm built in this town for them – I leave this town," meaning by "them" Orthodox Jews.

93. Councilmember Bressi, who represents the Township Council on the Township Planning Board, and Mayor Reina, who sits on the Township Planning Board, both stated that they knew of no reason why a private school should not be allowed in a zoning district that allows a public school.

94. Orthodox families are significantly less likely to move to a location that does not provide religious educational opportunities for their children.

95. Defendant Jackson foresaw and knew the discriminatory impact of the 2017 Ordinances, which effectively ban both religious day schools and yeshivas in Jackson.

96. Agudath Israel of America, Inc. ("Agudath Israel") and W.R. Property, LLC ("W.R.") (collectively "Private Plaintiffs") filed a separate action in 2017 alleging, in part, RLUIPA and Fair Housing Act violations stemming from the same events that form the basis of this Complaint.  See Agudath Israel v. Jackson, No. 17-cv-3226 (D.N.J.) (MAS) (DEA).

97. A number of Jackson's Orthodox residents belong to Agudath Israel, a non-profit organization founded to unite a broad array of local Orthodox community members.  Agudath Israel has a branch in New Jersey that advocates for the collective interests of Orthodox community.

98. Before passage of the 2017 Ordinances, W.R. purchased property in Jackson with the intent to construct an Orthodox religious school and identified multiple Orthodox groups interested in constructing one.

99. After Jackson passed the 2017 Ordinances and effectively prevented any religious school or dormitory from locating in Jackson, any application to construct a religious school and dormitory would be futile.

100. Agudath Israel believes that the Orthodox community in Jackson needs to have Orthodox religious schools to serve that population, including religious yeshivas with associated housing.

### Anti-Orthodox Animus in Jackson by Township Officials and Residents Continues after Enactment of 2017 Ordinances

101. Hostility toward the Orthodox community by Township officials and residents in Jackson has continued since the enactments of Ordinances 03-17 and 04-17 to the present time.

102. Shortly after enacting Ordinances 03-17 and 04-17, the Township enacted Ordinance 20-17, prohibiting obstructions in rights of way.  The Township enacted this ordinance in response to complaints by residents that the Orthodox community was seeking permits to construct an eruv, which are boundaries often

18

constructed of poles or wires and attached to utility poles.  These boundaries designate an area where the Orthodox Jews can perform certain activities on the Sabbath, such as carrying infants and pushing wheelchairs.

103. Ordinance 20-17 prohibited the use of utility poles to construct an eruv, and Jackson has taken enforcement action against members of the Orthodox community, thereby restricting where members of the Orthodox community may go on the Sabbath and other holy days.

104. Mayor Reina signed Ordinance 20-17 into law.  Councilmember Bressi stated that Mayor Reina told him, concerning an eruv in Jackson, that he would "never let them have wires in this town."

105. Anti-Semitic incidents have occurred in Jackson since the passage of the 2017 Ordinances:

> a. In November 2017, a tracing of a swastika appeared in the playground sand at Jackson's Woodland Park.
>
> b. In May 2019, a house scheduled for demolition in Jackson was defaced with anti-Semitic graffiti, including swastikas and the word "Hitler."
>
> c. In September 2019, a Jackson resident was charged with harassment and bias intimidation after swerving his car at two Orthodox individuals, forcing them to jump on the curb for safety, while yelling obscenities and insults related to their Jewish religion.

106. The anti-Semitic hostility, and anti-Orthodox statements, continue on social media related to the movement of the Orthodox community into Jackson and nearby areas.

107.  The Jackson NJ Strong Facebook group, which was available on Facebook until recently, was one of the social media groups with anti-Orthodox content.  Jackson NJ Strong embraced and encouraged its members to join a newly established Ocean County chapter of Citizens United to Protect Our Neighborhoods ("CUPON"), a group purportedly against development and espousing anti-Semitic views.  In August 2019, three Township officials, ZBA Chairman Sheldon Hofstein, ZBA member Joseph Sullivan, and Planning Board member Richard Egan resigned after reports and videos surfaced documenting their attendance at and participation in a CUPON meeting.

108. Rise Up Ocean County ("RUOC") was started in 2018 and had a public Facebook page with over 14,000 followers as of August 2019 RUOC also maintained a second closed-group Facebook page.  Facebook removed RUOC from its site recently, but the group still maintains an active website and other social media accounts.

109. RUOC's internet platforms contain posts, commentary, and videos about growth issues in Ocean County that include derogatory statements and imagery about Orthodox Jews.

110. On April 8, 2020, another existing Facebook group became Take Back Jackson, NJ and describes itself as "Calling out all the BS that effects [sic] Jackson residents."  This group has approximately 430 members and remains active.  It contains postings and comments similar to, and sometimes excerpted from, RUOC.

111. In early 2019, after discussing settlement with the Private Plaintiffs (see paragraph 96, above) for several months, the Township drafted ordinances to counteract Ordinances 03-17 and 04-17.  The Township never enacted the draft ordinances.  Instead, the Township decided to engage new legal counsel and to move forward with defending against the Private Plaintiffs' lawsuit.

### *United States' Notification of Suit Authorization And Subsequent Township Action*

112. On February 3, 2020, the United States informed the Township that it was authorized to commence a lawsuit against the Township under RLUIPA and the FHA.

113. On May 12, 2020, the Township Council voted to repeal Ordinances 03-17 and 04-17.

114. Residents participating in that meeting opposed repealing Ordinances 03-17 and 04-17.

115. During that meeting, Township officials stated that Ordinances 03-17 and 04-17 were being repealed because they were "redundant," that dormitories would still not be permitted anywhere in the Township after the repeal of the ordinances (*i.e.*, under the Township's pre-amended 2017 Ordinance), and that schools with dormitories would still not be allowed.

116. The Township Council's vote to repeal Ordinances 03-17 and 04-17 is one step in a multi-step process to repeal them.  A second reading by the Township Council, where the public will be invited to speak, is scheduled to occur on May 26,

2020. The repeal of the Ordinances will not happen at least until there is a second reading.

117. At all times relevant, the Township did not have in place procedures to ensure Township officials were able to satisfy their obligations under RLUIPA or the FHA, including but not limited to, providing RLUIPA or FHA training to Township officials and staff involved in religious land use determinations, and establishing procedures to address complaints concerning denials of rights under RLUIPA or the FHA.

## Count I: RLUIPA – Equal Terms

118. The allegations above are incorporated by reference.

119. The Defendants' enactment and application of the 2017 Ordinances and the Defendants' actions described in this Complaint constitute the imposition or implementation of a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution in violation of RLUIPA, 42 U.S.C. § 2000cc(b)(l).

## Count II: RLUIPA – Nondiscrimination

120. The allegations above are incorporated by reference.

121. The Defendants' enactment and application of the 2017 Ordinances and the Defendants' actions described in this Complaint constitute the imposition or implementation of a land use regulation that discriminates against any assembly or

institution on the basis of religion or religious denomination in violation of RLUIPA, 42 U.S.C. § 2000cc(b)(2).

## Count III: FHA

122. The allegations above are incorporated by reference.

123. The Defendants, through the conduct described in this Complaint, have discriminated in the sale or rental, or otherwise made unavailable or denied, dwellings to persons because of religion in violation of 42 U.S.C. § 3604(a).

124. The conduct of the Defendants described in the Complaint constitutes:

    a. A pattern or practice of resistance to the full enjoyment of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3601-3619; and/or

    b. A denial to a group of persons of rights granted by the Fair Housing Act, 42 U.S.C. §§ 3601-3619, which raises an issue of general public importance.

125. Members of the Orthodox community seeking to reside in Jackson and attend or be close to yeshiva schools, and others, are "aggrieved persons," as defined in 42 U.S.C. § 3602(i), and have suffered damages as a result of the Defendants' conduct described above.

126. The Defendants' conduct described above was intentional, willful, and taken in disregard for the rights of others.

## Prayer for Relief

**WHEREFORE,** the United States prays that this Court enter an order that:

A.  Declares that the Defendants' policies and practices, as alleged herein, violate RLUIPA;

B. Enjoins the Defendants, their officers, employees, agents, successors, and all other persons in concert or participation with them, from:

    i.   Treating the Orthodox community, and any other religious entities and institutions, and their members, on less than equal terms with nonreligious assemblies or institutions; and

    ii.  Discriminating against the Orthodox community, and any other religious entities and institutions, and their members, on the basis of religion or religious denomination;

C.  Requires the Defendants, their officers, employees, agents, successors, and all other persons in concert or participation with them, to:

    i.   Take such actions as may be necessary to prevent the recurrence of such unlawful conduct in the future, including, but not limited to:

        1.  Ensuring that religious assemblies or institutions are not treated on less than equal terms with nonreligious assemblies or institutions;

        2.  Providing RLUIPA training to its personnel;

        3.  Establishing procedures to address complaints of RLUIPA violations; and

        4.  Maintaining records and submitting reports relating to RLUIPA compliance;

D.  Declares that the Defendants' policies and practices, as alleged herein, violate the Fair Housing Act;

E.  Declares that the Defendants have engaged in a pattern or practice of discrimination in violation of the Fair Housing Act or have denied rights under the Fair Housing Act to a group of persons raising an issue of general public importance;

F.  Enjoins the Defendants, their officers, employees, agents, successors, and all other persons in active concert or participation with any of them, from discriminating in the sale or rental, or otherwise making unavailable or denying dwellings to renters, because of religion in violation of 42 U.S.C. § 3604(a);

G.  Awards monetary damages under 42 U.S.C. § 3614(d) to aggrieved persons harmed by the Defendants' discriminatory policies and practices; and

H.  Awards such additional relief as the interests of justice may require,

together with the United States' costs and disbursements in this action.

Dated May 20, 2020

Respectfully submitted,

WILLIAM P. BARR
Attorney General

CRAIG CARPENITO
United States Attorney
District of New Jersey

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

/s/ Kelly Horan Florio
KELLY HORAN FLORIO
Assistant United States Attorney
United States Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, NJ 07102
Phone: (973) 645-2824
kelly.horan@usdoj.gov

SAMEENA SHINA MAJEED
Chief

/s/ Beth Frank
TAMAR HAGLER
Deputy Chief
RYAN G. LEE
BETH FRANK
Trial Attorneys
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Phone: (202) 305-8196
beth.frank@usdoj.gov

| REVISIONS |
|---|
| Remington Vernick and Vena Eng. 4-10-2008 |
| Remington Vernick and Vena Eng. 5-01-2008 |
| Remington Vernick and Vena Eng. 12-20-2010 |
| Remington Vernick and Vena Eng. 12-2014 |
| Remington Vernick and Vena Eng. 11-09-2015 |
| Remington Vernick and Vena Eng. 5-12-2017 |
| Remington Vernick and Vena Eng. 6-29-2017 |
| Remington Vernick and Vena Eng. 7-26-2017 |

# ZONING MAP

## TOWNSHIP OF JACKSON

OCEAN COUNTY, NEW JERSEY

N W E S

0 2,500 5,000 10,000 15,000 Feet

### Zoning Legend

Air Installation Compatible Use Planning District Overlay
Conservation Planning District Overlay
Tax Parcel

**Jackson Township Zoning**

- AR Agricultural Retention
- CR-1 Commercial Recreation 1
- CR-2 Commercial Recreation 2
- HC Highway Commercial
- I Industrial
- LC Limited Commercial
- LM Light Industrial/Office/Manufacturing
- MF Multi Family
- MF-AH-6 Multi Family Affordable Housing (6 DU/Acre)
- MF-AH-7 Multi Family Affordable Housing 7 Zone
- MHP Mobile Home Park
- MR-AH-8 Mixed Residential-Affordable Housing-8 Zone
- MUNC/HC, Mixed-Use Neighborhood Center/Highway Commercial
- MUNC/LM, Mixed-Use Neighborhood Center/Light Industrial
- NC Neighborhood Commercial
- PFE Public Facilities and Education
- PMURD Planned Mixed Unit Residential Development
- PRC Planned Retirement Community
- R-1 Single Family Residential (Low Density)
- R-2 Rural Residential
- R-3 Rural Residential
- R-5 Restricted Residential
- R-9 Single Family Residential (Medium Density)
- R-15 Single Family Residential (Medium Density)
- R-20 Single Family Residential (Medium Density)
- R-30 Single Family Residential (Moderate Density)
- ROS Recreation and Open Space
- PED-1 Planned Environmental Development

**Pinelands Zoning**

- FA-1 Forest Area
- FA-2 Forest Area
- FA-6 Forest Area
- MI Military Installation
- PA Preservation
- PED-9 Planned Environmental Development
- PM Pinelands Manufacturing
- PV Pinelands Village
- PVC-1 Pinelands Village Commercial
- PVC-2 Pinelands Village Commercial
- RD Rural Development
- RD-1 Rural Development
- RD-9 Rural Development
- RG-2 Regional Growth
- RG-3 Regional Growth
- RGC-1 Regional Growth Commercial
- RGC-2 Regional Growth Commercial
- Jackson Pinelands Area Boundary

NOTES:
1.) THE CONSERVATION AND AIR INSTALLATION COMPATIBLE USE PLANNING DISTRICT OVERLAYS IN THE PINELANDS AREAS ARE PROVIDED FOR INFORMATIONAL REFERENCE ONLY. THERE ARE NO ORDINANCE REGULATIONS ASSOCIATED WITH EITHER OVERLAY IN THE PINELANDS AREAS."

2.) PINELANDS ZONING CHANGES AS PROPOSED IN THE 2009 MASTER PLAN PENDING BEFORE THE PINELANDS COMMISSION.

Zoning data prepared by Ragan Design Group Planning, LLC;
November 8, 2004 per Jackson Township Ordinance 40-04;
February 14, 2005 revised per Jackson Township Ordinance 06-05;
April 15, 2005 Pinelands Commission Resolution # PC4-05-22;
July 11, 2005 per Jackson Township Ordinance 28-05;
March 27, 2006 per Jackson Township Ordinance 07-06, pending Pinelands Commission Approval;
Amended by Jackson Township Ordinance No. 07-06 amending Chapter 109, Article IV, VI, XI, and Article VII (Pinelands Area Requirements) of the Municipal Land Use and Development Code of the Township of Jackson (Introduced and passed on the first reading March 13, 2006; Second reading, final passage and adoption March 27, 2006);
Amended by Jackson Township Ordinance No. 04-08 amending Chapter 109, Article IV, VI, XI, and Article XII of the Municipal Land Use and Development Code of the Township of Jackson (Introduced and passed on the first reading January 3, 2008; Second reading, final passage and adoption January 22, 2008).
Amended by Jackson Township Ordinance No. 10-17 amending Chapter 244, Article VI of the Land Use and Development Regulations, entitled Non-Pinelands Area Zoning District Regulations (Introduced and passed on the first reading May 23, 2017; Second reading, final passage and adoption June 13, 2017).
Amended by Jackson Township Ordinance No. 12-17 amending Chapter 244, Section 42 of the Land Use and Development Regulations, entitled List of Zones (Introduced and passed on the first reading July 25, 2017; Second reading, final passage and adoption August 22, 2017).
Amended by Jackson Township Ordinance No. 13-17 amending Chapter 244, Section 42 of the Land Use and Development Regulations, entitled List of Zones (Introduced and passed on the first reading July 25, 2017; Second reading, final passage and adoption August 22, 2017).
Amended Jackson Twp. Zoning Map, on July 26, 2017, by removing the un-adopted Ordinance 6-15, which was to establish the JBMDL zoning designation.

Revised in accordance with the 2009 Master Plan Land Use Plan Map LU-6, (as provided by the Alaimo Group, Mount Holly, NJ) for all parcels outside the Pinelands Area, and as amended by Ordinances Numbers 27-10, 28-10, 29-10, 30-10, 31-10, 32-10, 33-10, 34-10, 35-10, amending Chapter 109, Articles II, and VI, of the Municipal Land Use and Development Code of the Township of Jackson (Introduced on the first reading October 12, 2010. Second reading, final passage and adoption November 9, 2010.)

Tax parcel data developed by Civil Solutions, a division of ARH, updated and maintained by Remington, Vernick & Vena Engineers; last revised March 3, 2017.

RVV
Remington, Vernick & Vena Engineers
9 Allen St.
Toms River, NJ 08753
(732) 286-9220, Fax: (732) 505-8416
Web Site Address: www.rve.com

DATE:
CRAIG F. REMINGTON
PROFESSIONAL PLANNER LIC. NO. 1877

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*
Gregory McGuckin-Dasti,Murphy,McGuckin,Ulaky,Koutsouris,Connors
620 West Lacey Road,Box1057,Forked River,NJ08731 609-971-1010
Sean Gertner, Gertner & Gertner, 740 Bennetts Mill Road, Jackson Township, NJ 08527 732-523-5444

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. 2000cc et seq.; Fair Housing Act, 42 U.S.C. 3601 et seq.

Brief description of cause:  Unequal treatment of religious vs. non-religious entities in the enactment and application of land use laws as well as discrimination against the Orthodox Jewish community on the basis of religion.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.